UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re: ) | |
| ) | Case No. 09-34404-JGR |
| HEALTH TRIO, INC. ) | Chapter 7 (Involuntary) |
| ) | |
| Debtor. ) | |

## ORDER

The saga of the Health Trio, Inc. ("HT Inc.") bankruptcy case began on February 18, 2009 when an involuntary Chapter 7 bankruptcy petition was filed against it in the United States Bankruptcy Court for the District of Delaware. HT Inc. was originally owned and controlled by Dr. Malik M. Hasan ("Hasan"). Hasan also controls Health Trio, LLC ("HT LLC"). Over the years, Hasan engaged in a scheme to manipulate HT Inc.'s assets and defraud creditors.

### BANKRUPTCY CASE AND APPEALS

Roughly nine months after filing, the venue of HT Inc.'s bankruptcy case was transferred from the United States Bankruptcy Court for the District of Delaware to the United States Bankruptcy Court for the District of Colorado in November 2009. However, after the venue of the bankruptcy case was transferred from Delaware to Colorado, inexplicably, the bankruptcy judge in Delaware entered an order for relief against HT Inc. under chapter 7. The December 2009 order for relief led to appeals in the United States District Court for the District of Delaware; the Bankruptcy Appellate Panel of the Tenth Circuit; the United States District Court for the District of Colorado; and the United States Court of Appeals for the Tenth Circuit. The Tenth Circuit invited the parties to request the Colorado bankruptcy court to vacate the order for relief, which they did in October 2011. Thereafter, the Colorado bankruptcy court vacated the December 2009 order for relief.

Ultimately, a second order for relief was entered against HT Inc. under chapter 7 on May 2, 2012. Eventually, David E. Lewis was appointed chapter 7 trustee ("Trustee") on December 19, 2012. Unbelievably and without precedent, the gap period between the filing of the involuntary petition and entry of the order for relief was more than three and one-half years from February 18, 2009 to May 5, 2012 (the "Gap Period"). Even after the entry of the second order for relief, Hasan, the founder, majority shareholder and person in control of HT Inc., moved to vacate the order for relief in April of 2013, which the Colorado bankruptcy court denied on December 11, 2013. Thus, the issue of whether HT Inc. should be an involuntary debtor was litigated over four years.

HT Inc.'s bankruptcy case has been in two bankruptcy courts and presided over by several bankruptcy judges. There have been two chapter 7 trustees (a Colorado chapter 7 trustee was appointed in December 2009 after the first order for relief and a second Colorado trustee was the winner of a contested trustee election after the second order for relief in December 2012) and two adversary proceedings. The case is almost nine years old.

## QUESTION PRESENTED

The question presented by the parties is whether Dennis W. Scruggs ("Scruggs"), is entitled to compensation of $94,000 for services rendered to HT Inc. in the ordinary course of its business or financial affairs during the Gap Period. The Court held an evidentiary hearing on Scruggs' amended claim number 13 and the Trustee's objection, at which Scruggs and the Trustee testified. For the reasons set forth below, the Court awards Scruggs a Gap Period priority claim in the amount of $46,959 and a Chapter 7 administrative expense priority claim in the amount of $23,250, for a total allowed claim in the amount of $70,209.

## BACKGROUND

### (2000-2005)

Hasan was the founder and majority shareholder of HT Inc., which he started in 2000. HT Inc. developed and licensed software used by health insurance companies to administer claims. Scruggs is a certified public accountant. HT Inc. employed Scruggs as chief financial officer ("CFO") on July 15, 2004 at a salary of $122,500 per year. His duties from July 2004 through February 2009 for HT Inc. included managing cash receipts and disbursements, performing financial and tax accounting and reporting, managing HT Inc.'s contracts and routinely interfacing with attorneys on HT Inc.'s litigation.

Hasan made numerous cash contributions to HT Inc. from 2000 through 2005 totaling at least $16.8 million. HT Inc.'s board of directors did not approve Hasan's contributions at the times they were made and Hasan did not obtain security at the times they were made. At a December 2005 board meeting, HT Inc.'s board voted to enter into a security agreement for Hasan's cash contributions, secured by all of HT Inc.'s assets. Scruggs signed Hasan's security promissory notes and security agreement as an officer of HT Inc.

### (2005-2007)

Immedient Corporation ("Immedient") had sued HT Inc. in 2001 and obtained a judgment in 2007. Immedient was one of the three petitioning creditors against HT Inc.

Hassan demanded payment in full from HT Inc. In 2007, he sued HT Inc. on the secured notes. HT Inc. did not defend, and he obtained a default judgment against HT Inc. for $21.79 million. Scruggs signed an affidavit in support of Hasan's judgment and an assignment of assets. Thereafter, HT Inc. surrendered its assets to Hasan and Hasan formed HT LLC. Hasan purchased HT Inc.'s assets at a foreclosure sale in August 2007 for a $5 million credit bid and transferred such assets and HT Inc.'s business to HT LLC.

Most of HT Inc.'s employees began working for HT LLC as of October 1, 2007, including Scruggs, as CFO. HT LLC operated the exact same business as HT Inc. Scruggs testified he was never terminated and never resigned as CFO of HT Inc. and that he was the only officer of HT Inc. after August 2007.

**(2007-2010)**

Scruggs was hired by Hasan as HT LLC's CFO from October 1, 2007 until January 2010, at the same salary he was paid by HT Inc. He testified he had two CFO positions from February 18, 2009 through January 2010, one for HT LLC for which he was compensated at his regular salary and one for HT Inc. for which he was not compensated. He said he worked sixty hours per week instead of forty hours per week in that time frame. He maintained two sets of books, one for HT LLC and one for HT Inc. When questioned about signing the insider foreclosure documents, Scruggs testified he was an accountant, not a lawyer, and, as an employee of HT Inc., he did what he was told. He also testified he was not privy to what was going on behind the scenes with Hasan and counsel for Hasan and HT LLC, Glenn W. Merrick ("Merrick"), and that he trusted Merrick.

After the Delaware court entered an order for relief in December 2009, HT Inc. filed bankruptcy schedules and a statement of financial affairs in the Colorado bankruptcy court in January 2010. Scruggs assisted in preparing the documents and signed them as an officer of HT Inc.

Hasan made an assignment of his stock in HT Inc. to Scruggs, which gave Scruggs a majority of HT Inc.'s stock. The assignment is dated December 12, 2008, but Scruggs testified it was actually signed in 2009 after the filing of the involuntary petition. Scruggs testified he received the assignment in 2009 and held 59.23% of HT Inc.'s stock in January 2010, when HT Inc.'s schedules and statement of financial affairs were filed. The list of HT Inc.'s equity security holders reflects his 59.23% equity interest. Later, in May 2012, Merrick attempted to get him to sign the assignment a second time. The assignment to Hasan allowed him to participate in the trustee election in December 2012 since he was no longer an insider or shareholder of HT Inc. The significance of the assignment to Scruggs was that he owned a majority of HT Inc.'s stock, which gave him control of HT Inc. and allowed Scruggs to confess the order for relief on behalf of HT Inc. on August 14, 2013. HT Inc. filed an amended list of equity security holders in the bankruptcy case on June 21, 2012, showing Scruggs held 59.23% of HT Inc.'s stock and Hasan held zero.

Scruggs became concerned about his potential liability and future due to the involuntary petition litigation. He composed a "wish list" to Hasan in January 2010 outlining terms for him to continue as CFO of HT LLC. In the letter, Scruggs states he was going to resign as the CFO of HT LLC and HT Inc. unless he received certain concessions from Hasan, the most important of which was an indemnification from Hasan relating to Scruggs' activities as an officer, director and shareholder of HT Inc., since HT Inc. did not have directors' and officers' liability insurance. When Hasan declined, Scruggs resigned from HT LLC in January 2010.

3

**(2010-2012)**

Scruggs testified he remained CFO of HT Inc. during and after the Gap Period until the Trustee was appointed in December 2012. He argues the ordinary course of business or financial affairs of HT Inc. during the Gap Period was to wind down HT Inc.'s operations, and his services as an officer of HT Inc. are compensable as a Gap Period claim. He asserts he could have left HT Inc. and let the "chips fall," to the detriment of HT Inc. and ultimately the HT Inc. bankruptcy estate.

Scruggs claims he should be compensated as a priority gap period creditor for the reasonable value of his chief financial officer services rendered to HT Inc. in the ordinary course of its business or financial affairs during the Gap Period in the amount of $93,917. His compensation request is his estimate of the hours he spent for HT Inc. multiplied by his rate of $62 per hour, based on his annual salary of $122,500.

He requests $51,042 for an estimated 823 hours of services rendered to HT Inc. from March 1, 2009 to December 31, 2009, which he estimates was 54% of his total time between HT Inc. and HT LLC in that time period, and $42,875 for an estimated 692 hours of services rendered to HT Inc. from January 1, 2010 to April 30, 2012.

Scruggs estimates he spent 450 of the 1,515 hours in the Gap Period, cataloguing, identifying, maintaining and preserving documents for a notebook he prepared in support of the bankruptcy estate's litigation claims against Hasan, HT LLC and Merrick. The Court notes Scruggs did not keep contemporaneous time records in the Gap Period.

Scruggs testified that in the Gap Period, in the ordinary course of HT Inc.'s business or financial affairs, he: (i) filed HT Inc.'s required financials and tax returns; (ii) interfaced with investors of HT Inc., whom he stated deserved response communications since HT Inc. did not do regular reporting; (iii) interfaced with Delaware and Colorado bankruptcy counsel for HT Inc.; (iv) prepared and executed HT Inc.'s statement of financial affairs and schedules in January 2010; (v) administered certain non-assignable contracts HT Inc. had with health insurance companies for value, eliminated breach of contract claims against HT Inc. and reduced the amount owed to Hasan; (vi) dealt with two leases of real property; and (vii) reviewed, catalogued and preserved over 200,000 files (including HT Inc.'s hard drive) encompassing 500,000 documents from HT Inc. in support of the potential fraudulent transfer and malpractice litigation resulting from Hasan's insider foreclosure of HT Inc.'s assets.

**(2012-2016)**

The Colorado bankruptcy court denied Hasan's motion to vacate the order for relief in December 2013 and the contest of the involuntary petition was finally resolved.

In August 2013, Hasan, with Merrick as his counsel, sued Scruggs in state court, in two separate civil actions to obtain a rescission of the stock assignment and other relief. Hasan wanted it both ways. He did not want to be a majority shareholder for the purpose of participating in the trustee election (which occurred in December 2012), but wanted to be a majority shareholder so he could continue to control HT Inc. and defend the involuntary petition.

4

Scruggs defeated both suits, one of which he won at the Colorado Court of Appeals. He estimated he spent approximately 800 hours and thousands of dollars defending himself, not to mention the stress incurred.

In this time period, Scruggs presented the Trustee with a six-inch three-ring binder litigation notebook for use in the investigation and prosecution of two adversary proceedings: a fraudulent transfer case against Hasan and HT LLC, and a legal malpractice case against Merrick. The Trustee settled both cases in 2016 for a combined total of $1,225,000. The notebook was a "roadmap" for the Trustee. Scruggs actively assisted the Trustee's counsel in formulating and prosecuting the respective complaints. The complaints were detailed and comprehensive, containing numerous claims for relief. He had frequent meetings, located documents, answered questions, was deposed several times, and responded to e-mails with two sets of litigation counsel retained by the Trustee. He estimated he spent 750 hours in this category after the order for relief. The Court notes Scruggs did not keep contemporaneous time records for the services rendered after the order for relief and the litigation notebook was not introduced into evidence.

The Trustee claims HT Inc. had no business as of October 1, 2007 since all of its employees were terminated and its assets and business were transferred to HT LLC. The Trustee disputes Scruggs was an officer of HT Inc. after October 2007. The Trustee also asserts Scruggs failed to satisfy his burden of proof by not presenting contemporaneous time records to support the reasonable value of his services. Therefore, since HT Inc. did not have an ordinary course of business in the Gap Period, Scruggs' claim must fail.

Moreover, the Trustee describes Scruggs as a "clever opportunist" who initially opposed the involuntary petition with Hasan. Scruggs executed most of the insider foreclosure documents for the benefit of Hasan and administered the contracts for the benefit of Hasan and not HT Inc. at a time he was being compensated his regular salary as the CFO of HT LLC. The Trustee asserts Scruggs was Hasan's "puppet," who changed sides after his request for indemnification was rejected by Hasan, for his personal benefit.

Finally, the Trustee claims Scruggs concocted his claim after the Trustee settled the adversary proceedings in June 2016. This is allegedly evidenced by Scruggs' failure to note his Gap Period Claim in HT Inc.'s statement of financial affairs and schedules he filed in January 2010, his failure to note his claim in his financial affidavit in his divorce case in 2008, his failure to note his claim in his initial proofs of claim filed in this case, and his failure to request compensation directly from Hasan. While the Trustee admits Scruggs provided critical litigation assistance, which the estate accepted and clearly benefited from, since those efforts were after the order for relief and not in the Gap Period, the Trustee claims they are not compensable in this chapter 7 case.

## LEGAL STANDARDS

### Burden of Proof

A proof of claim is *prima facie* evidence of its validity and amount. The objecting party has the burden of going forward with evidence supporting the objection. Such evidence must be of probative force equal to that of the allegations in the proof of claim. Once the objecting party has reached this threshold, the claimant has the ultimate burden of persuasion as to the validity and amount of the claim. *See In re Richter*, 478 B.R. 30, 40 (Bankr. D. Colo. 2012) (citing *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993). Scruggs has the ultimate burden of persuasion on his claim because the evidence supporting the Trustee's objection has a probative force equal to that of the allegations in Scruggs' proof of claim.

### Involuntary Gap Period Claim

Section 502(f) states:

§ 502. Allowance of claims or interests

(f) In an involuntary case, a claim arising in *the ordinary course of the debtor's business or financial affairs* after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(f) (emphasis added).

In the Tenth Circuit, the burden of proof is on the party seeking a priority claim by a preponderance of the evidence, *In Re Mid Region Petroleum*, 1 F.3d 1130, 1132 (10th Cir. 1993), because priority claims under the Bankruptcy Code must be strictly construed. *In re Amarex,* 853 F.2d 1526, 1530 (10th Cir. 1988).

In order to hold a priority gap claim, which is a third level priority claim under § 507(a), after only domestic support obligations and administrative expenses, the claim must have arisen in the ordinary course of business or financial affairs of the debtor after the commencement of the case but before the entry of the order for relief. Section 303(f) provides that *any* business of the debtor may continue to operate in the gap period (emphasis added). Only debts that arise after the filing of the bankruptcy petition may be accorded administrative expense status. *In re Baldwin–United Corp.*, 43 B.R. 443, 453 (S. D. Ohio 1984). Section 503 specifically excepts 502(f) involuntary "gap creditors" from administrative priority status. *See* 11 U.S.C. § 503(b); *In re Hanson Indus., Inc.,* 90 B.R. 405, 413 (Bankr. D. Minn.1988). Gap creditors are those who extend credit, lend money, or have claims which arise during the gap period between the filing of

the involuntary petition and the entry of an order for relief. *In re Manufacturer's Supply Co.,* 132 B.R. 127, 128 (Bankr. N .D. Ohio 1991).

The cases on disputed involuntary gap period claims fall into two categories. In one category, the courts have applied a strict standard and held that attorney's fees and expenses incurred in unsuccessfully defending an involuntary petition do not fall within the scope of a debtor's ordinary course of business or financial affairs. In the other category, the courts have applied a less stringent standard and awarded involuntary gap period claims to employees, lessors and attorneys.

The case of *In re Baab Steel,* 495 B.R. 530 (Bankr. D. Colo. 2013), represents the strict approach. There, the bankruptcy court refused to accord priority gap claim status to the fees and expenses of counsel incurred unsuccessfully defending the involuntary petition, finding legal work incurred defending an involuntary petition was not a claim arising in the ordinary course of a debtor's business. The Court stated, "This section may reach routine or ongoing legal services performed in the gap period; it does not reach services rendered in opposing the involuntary petition against a debtor who has admitted being out of business for a number of years." *In re Baab Steel* at 534. The gap period there was approximately six months.

In the case of *In re Commonwealth Sprinkler Co.,* 295 B.R. 852, 855 (Bankr. E. D. Va. 2003), the bankruptcy court refused to accord priority gap claim status to the fees and expenses of counsel incurred unsuccessfully defending the involuntary petition, concluding the charges were not in the ordinary course of the debtor's business. That gap period was approximately four months.

In the case of *In re Manufacturer's Supply Co.,* 132 B.R. at 127, the bankruptcy court declined to award a gap period priority claim to the president of the involuntary corporate debtor for a loan he made to the corporate debtor in the gap period to retain attorneys to unsuccessfully challenge the involuntary petition, as not in the ordinary course of the debtor's business. The gap period was approximately one month.

In the case of *In re Hanson Indus., Inc.,* 90 B.R. at 405, the bankruptcy court found attorney's fees and expenses incurred in unsuccessfully defending an involuntary petition were not incurred in the ordinary course of the debtor's business. However, the court did award attorney's fees and expenses in the gap period for routine legal work. In examining the meaning of ordinary course of business or financial affairs under § 502(f), the court found the statute was intended to protect creditors who deal with the involuntary debtor in the gap period, including trade creditors and lessors, since the involuntary debtor is allowed to continue with its business or financial affairs despite the imposition of the involuntary petition. *In re Hanson Indus.* at 413. The gap period was approximately three months.

In the case of *In re Howrey LLP,* 534 B.R. 373 (Bankr. N. D. Cal. 2015), the bankruptcy court held that the claims of commercial landlords for unpaid rent accrued during the gap period were entitled to priority status. The court found the accrual of rent was in the debtor's ordinary course of business. The objecting party argued that since the debtor was winding down by the petition date, the gap claims did not arise in the debtor's normal business. The court rejected that

7

claim and responded, "The Committee's argument, to prevail, would have the court insert into section 502(f) the following change: In an involuntary case, a claim arising in the ordinary course of the debtor's business *except when the debtor has begun to liquidate its business."  In re Howrey* at 378.  The gap period was two months.

In the case of *In re Advanced Elec.*, 107 B.R. 503 (Bankr. M.D. Pa. 1989), the bankruptcy court allowed employee wages as a gap period priority claim.  The Court stated, "Often a business put into an involuntary Chapter 11 bankruptcy must, in the ensuing days and the weeks after the filing of the involuntary, struggle to keep existing business relationships intact." *Id.* at 504.  "This Court will not penalize them because they have exhibited a loyalty and have worked diligently to help the debtor through the involuntary gap period.  Consequently, we find no merit in the objector's argument that the employees were not performing their duties in the ordinary course of business." *Id.* at 505.  The gap period was one month.

Thus, the Court holds the interpretation of the phrase in § 502(f), "a claim arising in the ordinary course of the debtor's business or financial affairs," must be made on a case-by-case basis.  The cases hold that routine professional or employee services provided or debts incurred in the gap period in the ordinary course of the debtor's business or financial affairs are allowable, even if the involuntary debtor has begun to liquidate its business.  Thus, the term financial affairs includes winding up the debtor.

The Trustee cites the Tenth Circuit case of *In re C.W. Mining Co.,* 798 F.3d 983 (10th Cir. 2015) to argue the ordinary course of business or financial affairs standard of § 502(f) should be construed narrowly.  The Court disagrees.  The question before the Tenth Circuit in the *C.W. Mining* case was the interpretation of the term ordinary course of business or financial affairs in defense of a preferential transfer claim. The Tenth Circuit, relying on earlier precedent, ruled the ordinary course of business or financial affairs defense to a preferential transfer claim is construed narrowly in this circuit.  The Tenth Circuit rejected the Trustee's argument to use the even narrower definition of ordinary course of business contained in Bankruptcy Code § 364(a) regarding post-petition financing.  The Tenth Circuit stated that since the purpose of the ordinary course of business or financial affairs defense to a preferential transfer claim is different from the purpose of the use of the term in the context of post-petition financing, the meaning of the term ordinary course of business need not be the same for both sections. *C.W. Mining* at 988, n. 3.

The purpose of the ordinary course of business defense to a preferential transfer claim is to protect the creditors of the debtor during its slide into bankruptcy.  It is interpreted narrowly to protect creditors' rights under limited circumstances without undermining the purpose of recovering preferential transfers.  That is, the equal treatment of similarly situated creditors.

The purpose of § 364(c) is to determine when a post-petition financing transaction is so out of the ordinary course of business of the debtor that the debtor must request bankruptcy court approval of such financing with notice to creditors and an opportunity to object and be heard, to protect creditors' rights.  Thus, those two sections are interpreted narrowly.

8

The purpose of Bankruptcy Code § 502(f) is to protect and encourage parties to deal with an involuntary debtor until the involuntary petition is resolved. The concept under § 502(f) should be broadly construed in protecting creditors and parties who deal with an involuntary debtor. After all, not every involuntary petition results in an order for relief. A debtor's authorization to operate any business in the gap period would mean little unless parties dealing with a debtor have assurances of getting paid.

## Administrative Claim

Section 503(b)(3)(D) states:

§ 503. Allowance of administrative expenses

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, *including-*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title.

11 U.S.C. § 503(b)(3)(D) (emphasis added).[1]

The facts of this case raise two issues. Can the bankruptcy court ever award a substantial contribution claim in a chapter 7 case? If so, what is a substantial contribution?

This Court believes a party can be awarded a chapter 7 administrative expense priority claim if such party makes a substantial contribution to a case under Chapter 7, even though only one section of the statute specifically refers to chapters 9 and 11.

There is a nationwide split of authority on this issue, including a split in the two circuit courts which have addressed the question, the Third Circuit and the Sixth Circuit. A majority of courts, including the Third Circuit, read the statute narrowly and conclude it prohibits a substantial contribution claim in a chapter 7 case. *In re Lloyd Sec., Inc.,* 75 F.3d 853, 857 (3d Cir. 1996), *Lebron v. Mechem Fin., Inc.,* 27 F.3d 937, 945 (3d Cir. 1994), *In re Watson,* 495 B.R. 88, 93 (Bankr. D. Colo. 2013), and *In re Kahler,* 84 B.R. 721, 723 (Bankr. D. Colo. 1988).[2]

---

[1] In closing argument, the Trustee cited the case of *In re Watson*, 495 B.R. 88 (Bankr. D. Colo. 2013), for the proposition that a § 503(b)(3)(D) claim could not be awarded in a chapter 7 case. The Court located cases contrary to *Watson* and found them persuasive.

[2] The Colorado bankruptcy cases do not contain an analysis of this issue. The court in *In re Watson* followed the Third Circuit's holding in *Lebron*.

9

The Third Circuit in the *Lloyd Securities* and *Lebron* cases held a party cannot get a substantial contribution claim in a chapter 7 case, without any analysis.

The precise question presented is whether the inclusion of the "substantial contribution in a case under chapter 9 or 11" language in § 503(b)(3)(D), negates the meaning of "including" in the introductory paragraph of § 503(b), such that the bankruptcy court does not have the authority to allow an administrative claim in a chapter 7 case to a creditor who makes a substantial contribution to the bankruptcy estate.

The majority view relies on the axiom that administrative expenses must be narrowly construed since they reduce the funds available for creditors and other parties. *See, e.g., In re Amarex,* 853 F.2d at 1530.

Second, the majority view reads the plain language of the statute and the principle of statutory construction that "Congress says in a statute what it means and means in a statute what it says there," and that since Congress clearly knew how to create an administrative expense claim for a substantial benefit in chapters 9 and 11, it could have done the same for chapter 7. *See, e.g., In re Hackney,* 351 B.R. 179, 201 (Bankr. N.D. Ala. 2006).

Third, the majority view believes that although the word "including" is used in the introductory paragraph of § 503(b), those words are not used in § 503(b)(3)(D), and the minority's reading of the statute to include a substantial contribution claim in a chapter 7 case would write the specific language of § 503(b)(3)(D) out of the statute and render it superfluous.

Fourth, the majority view employs the doctrine of *expressio unius est exclusio alterius,* under which a court infers congressional intent to restrict the application of the statute to the specific listed examples. Here, the majority view asserts the specific inclusion of chapters 9 and 11 in the statute is the specific exclusion of chapter 7. *See e.g. In re United Educ. & Software,* 2005 WL 6960237 at *7 (9th Cir. BAP 2005).

The Sixth Circuit case of *In re Connolly North America, LLC*, 802 F.3d 810 (6th Cir. 2015), represents the minority view. The Sixth Circuit ruled that a creditor, whose actions in a chapter 7 case significantly increased the dividend to itself and other unsecured creditors, could be awarded a substantial contribution claim even though it was not a chapter 9 or 11 case. In *Connolly,* unsecured creditors successfully removed the chapter 7 trustee. The successor chapter 7 trustee sued the former chapter 7 trustee, which resulted in a beneficial settlement for the estate. The creditors applied for reimbursement of attorney's fees and costs incurred. The creditors took action in a chapter 7 case when no other party was willing or able to bring about the same result. The bankruptcy and district courts denied the motion, holding that substantial contribution claims are only awarded in chapter 9 or chapter 11 cases, under a strict reading of the language of § 503(b)(3)(D).

The Sixth Circuit reversed and held: (i) the categories of administrative expenses set forth in § 503 are not exhaustive because the statute uses the words "includes" in the introductory paragraph and the statute intends to provide flexibility to courts to award administrative expenses not specifically mentioned since bankruptcy courts encounter a variety of circumstances; (ii) it is

10

proper for a court of equity to award a substantial contribution claim in certain circumstances in a chapter 7 case where creditors substantially assist the United States Trustee and/or the chapter 7 trustee in chapter 7 cases; (iii) chapter 7 was excluded from the language of the statute because of the watch-dog role of the Office of the United States Trustee; (iv) there is no distinction between the chapters, and the court's interpretation of § 503(b)(3)(D) is consistent with the policies of the bankruptcy code to encourage creditor participation in all bankruptcy cases, including chapter 7 cases; and (v) the court cited § 102(3) of the Bankruptcy Code, titled, "Rules of Construction," which states the terms "includes" and "including" are not limiting, to support its expansive reading of the statute, concluding any other reading is illogical and thus rendering the *expressio unius* rule inapplicable to § 503. *See Connolly*, 802 F.3d at 816-18.

The dissent in *Connolly* observed that 86% of bankruptcy or district courts denied recovery of a substantial contribution claim in a chapter 7 case and only 14% allowed recovery of a substantial contribution claim in a chapter 7 case. *Connolly*, 802 F.3d at 822, n.2.

The Sixth Circuit's analysis was recently approved and applied in a chapter 7 case in *In re Maqsoudi,* 566 B.R. 40 (Bankr. C.D. Cal. 2017), and a chapter 13 case in *In re Sharkey,* 2017 WL 5476486 (E.D. Mich. 2017). In *Maqsoudi,* the bankruptcy court awarded a substantial contribution claim in a chapter 7 case to creditor who provided important assistance to the trustee in the recovery of assets. In *Sharkey,* the District Court affirmed the bankruptcy court's award of a substantial contribution claim in a chapter 13 case to a creditor who initiated an objection to the debtor's exemption claim in certain valuable annuities in the chapter 7 portion of the case and successfully continued the litigation after conversion of the case to chapter 13, which resulted in the disallowance of the exemption claim.

Having concluded a party can obtain a substantial contribution claim in a chapter 7 case, the next inquiry is, what is a substantial contribution? The Tenth Circuit denied a request for a substantial contribution claim in a chapter 11 case in *In re Lister,* 846 F.2d 55 (10th Cir. 1988). It held that "there must be an actual, direct and demonstrable benefit to the bankruptcy estate." *Lister* at 57. In *Lister,* the Tenth Circuit declined to award a substantial contribution claim to a judgment creditor who attached and froze certain assets of the debtor in the pre-petition period and who furnished assistance in recovering hidden assets in the post-petition period, finding the contribution was self-motivated, incidental and not substantial. *Lister* at 58.

In *Connolly,* a substantial contribution claim was awarded to creditors who successfully removed and sued the first trustee for the benefit of the estate; in *Maqsoudi,* to a creditor who assisted a trustee in recovering assets; and, in *Sharkey,* to a creditor who successfully objected to the debtor's claim of exemptions.

## ANALYSIS

The Court concludes that HT Inc.'s winding up its business in the Gap Period was HT Inc.'s ordinary course of business or financial affairs and that a party can be awarded a substantial contribution claim in a chapter 7 case.

11

As a certified public accountant, Scruggs testified there are many stages of a business. The business starts with an idea, then a business plan, then investment into the business, then the creation of a legal entity, then the development stage, then the maturity/prosperity stage and, finally, the winding up stage, whether by sale of assets or dissolution. An orderly wind up could take years to conclude. The Court finds the winding up of HT Inc.'s business in the Gap Period was within the ordinary course of business and financial affairs of HT Inc. Otherwise, it would have to insert the clause, "except when the debtor is winding up its business or financial affairs" in § 502(f), in order to accept the Trustee's argument. *See In re Howrey* at 378.

Scruggs was a credible witness who withstood the Trustee's rigorous cross examination. His story never wavered and he had adequate responses to hours of questions, such as his execution of the insider foreclosure documents, his alleged "switching of sides" from defending the involuntary to confessing it, and his failure to disclose his claims in HT Inc.'s bankruptcy schedules and statement of financial affairs or in his divorce case. Scruggs knew Hasan put millions of dollars into HT Inc. The decisions on whether Hasan's contributions to HT Inc. were debt or equity or whether Hasan's insider foreclosure was proper or fraudulent, were not Scruggs' to make. Scruggs did not personally benefit from the insider foreclosure. He was in a "hornets' nest" dealing with the litigious Hasan and Merrick, which litigation eventually was pointed at him. To his credit, he defeated Hasan and Merrick in various courts of law.

Scruggs provided routine CFO services to HT Inc. in the Gap Period described in detail above, for the benefit of HT Inc. and ultimately HT Inc.'s bankruptcy estate. Scruggs "exhibited a loyalty" and "worked diligently." *See In re Advanced Elec.* at 505. His rate of $ 62 per hour is reasonable. It was not Scruggs' fault that the Gap Period lasted over three years.

However, the lack of contemporaneous time records is a concern, especially when the Gap Period was many years ago, from 2009-2012. In the exercise of judicial discretion and to reach a fair and equitable result as a court of equity, the Court will award Scruggs 50% of the compensation requested in the Gap Period or $46,959, for CFO services rendered to HT Inc. in the ordinary course of its business or financial affairs.

Scruggs also provided a substantial contribution to the chapter 7 bankruptcy estate in the post-petition period by conferring an actual, direct and demonstrable benefit to the estate in supporting the trustee's litigation claims. His contribution was especially valuable in this chapter 7 case with a three and one half year gap period and a second chapter 7 trustee with no personal knowledge of prior events. He was adamant that Hasan's insider foreclosure, and the legal ramifications of the same, should "be brought to light in a court of law." His services are detailed above, but he became the face of HT Inc. in pursuit of the litigation claims and assisted the Trustee in every way without an advance payment arrangement with the Trustee. The reason the litigation cases settled was due to the issue of provable damages, not shortcomings of Scruggs. The undersigned judge served as a chapter 7 trustee for over thirty years. Many times the chapter 7 trustee is faced with a business and its books and records in shambles. Thus, the Court is keenly aware of the value of the contribution Scruggs made to the HT Inc. estate by preserving HT Inc.'s hard drive and documents and creating a chronology of the insider

foreclosure. Those assets would normally be lost to a chapter 7 trustee in the three and one half year gap period for a company winding up operations.

Again, the lack of contemporaneous time records is a concern in fashioning an award since the time period in question is from 2012-2016. The Court encourages creditor participation in bankruptcy cases and wishes to provide an incentive to creditors to meaningfully participate. In the view of the Court, creditor participation enhances the transparency of and public confidence in the bankruptcy system. In the exercise of judicial discretion and to reach a fair and equitable result as a court of equity, the Court will award Scruggs 50% of the 750 hours he estimates he spent in the post-petition period, at his hourly rate of $62, or $23,250.

## CONCLUSION

Scruggs was in a difficult situation for many years. He could have walked away from HT Inc. in January 2010, but he chose to finish what he started. Scruggs is awarded a priority gap period claim in the amount of $46,959 and a chapter 7 administrative expense priority claim in the amount of $23,250, for a total award in the amount of $70,209, which, absent an appeal, shall be paid by the Trustee within fourteen days of the date of this order.

Should the Trustee disagree with this holding regarding the substantial contribution claim in a chapter 7 case, the Court would consider certifying a direct appeal to the Tenth Circuit under 28 U.S.C. § 158(d)(2), since this involves a question of law as to which there is no controlling authority in the Tenth Circuit or the United States Supreme Court and for which there is a split of authority in the Circuit Courts that have considered this question.

Dated this 24th day of January, 2018.   BY THE COURT:

_____
Joseph G. Rosania, Jr., Bankruptcy Judge